UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Timothy P. Miller,

Petitioner,

v. Civil Action No. 2:13-cv-211

Andrew Pallito,

Respondent.

**REPORT AND RECOMMENDATION**
(Docs. 4, 5)

Petitioner Timothy P. Miller, proceeding *pro se*, is a Vermont state prisoner seeking a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. 4.) After a jury trial in March 1983, he was convicted of second degree murder for the April 1982 death of Timothy O'Neal; the Vermont Supreme Court affirmed in July 1985. *State v. Miller*, 146 Vt. 164, 166–70, 502 A.2d 832, 834–36 (1985). In April 1989, the Vermont Supreme Court affirmed the denial of Miller's motion for a new trial. *State v. Miller*, 151 Vt. 337, 337, 560 A.2d 376, 376 (1989). Jeffrey Amestoy—who was Vermont's Attorney General at the time—represented the State on appeal in the matter regarding the motion for a new trial.

In 1997, Jeffrey Amestoy was appointed Chief Justice of the Vermont Supreme Court. In 1998, the Supreme Court issued two Entry Orders related to Miller's petition for post-conviction relief (PCR). In an Entry Order dated March 5, 1998, the Supreme

Court affirmed a Superior Court order finding insufficient evidence to grant his petition for PCR. *In re Miller*, 168 Vt. 583, 583, 718 A.2d 419, 420 (1998) (mem.). In an Entry Order dated June 11, 1998, the Supreme Court denied as untimely Miller's March 19, 1998 motion to disqualify the five Justices who participated in the PCR appeal. *In re Miller*, 168 Vt. 585, 585–86, 718 A.2d 422, 422 (1998) (mem.). Attorney Michael Rose represented Miller in the PCR appeal.

In his current Petition—filed August 5, 2013—Miller argues that he was deprived of due process in the PCR appeal because the Vermont Supreme Court Justices who participated in that case did not recuse themselves. (Doc. 4 at 5, 8.) He also argues that Attorney Rose provided ineffective assistance of counsel for failing to know that then-Attorney General Amestoy represented the State in the appeal regarding the motion for a new trial. (*Id.* at 7.) Respondent Andrew Pallito, Commissioner of the Vermont Department of Corrections, moves to dismiss the Petition as time-barred under 28 V.S.A. § 2244(d). (Doc. 5 at 1.) Miller opposes dismissal, arguing that any time limitation is overcome because he is actually innocent. (Doc. 6 at 1.) Respondent maintains that Miller's evidence of actual innocence is insufficient to overcome the statute of limitations. (Doc. 11 at 1.)

For the reasons that follow, I recommend that Respondent's Motion to Dismiss (Doc. 5) be GRANTED and that Miller's Petition (Doc. 4) be DISMISSED.

## Factual Background

Two versions of the events underlying Miller's conviction are before the Court. One version is the summary of the evidence in the light most favorable to the State, as

recited in 1985 by the Vermont Supreme Court in *State v. Miller*, 146 Vt. 164, 502 A.2d 832. The second version is Miller's unsworn narrative contained in his Opposition to Respondent's Motion (Doc. 6 at 1–2), along with the August 17, 2013 affidavit of Michael Germaine (Doc. 6-1), and the October 1, 2013 affidavit of Todd Gorton (Doc. 8-1). I include the first version here, and return to Miller's version of the events in the discussion below regarding his claim of actual innocence. As summarized by the Vermont Supreme Court, the evidence in the light most favorable to conviction is as follows.

> During the afternoon of April 8, 1982, the victim, Timothy O'Neal, cashed his paycheck and, possessing more than $200, began frequenting bars in the vicinity of the Champlain Mill, a shopping mall in Winooski. By evening, O'Neal was very drunk. Although not violent, he became a persistent nuisance at a bar called "Le Club." After several female patrons complained, Le Club's bartender expelled O'Neal, who returned twice more and was expelled each time.
>
> Defendant and a companion, Richard Sorrell, were also patrons at Le Club. After O'Neal's third expulsion, Le Club's manager asked defendant and Sorrell, who were then standing outside, to take care of O'Neal and they agreed to do so. Soon thereafter, O'Neal entered Le Club again, to retrieve his coat. Defendant pursued him and pulled him outside before it could be found.
>
> A service road ran between the Champlain Mill and Le Club, leading to a rear parking lot and service entrances. A cement abutment at the rear of the parking lot borders the Winooski River as it runs downstream to a waterfall. An irregular hole in the abutment permits access to the river bank.
>
> Between 11:30 p.m. and midnight, shortly after defendant had pulled O'Neal out of Le Club, a witness [Daniel Tobler] saw defendant, O'Neal and Sorrell walking down the service road toward the river. Later, another witness saw two men walking together along the river bank, toward the falls, looking into the water.

Some time after midnight, defendant appeared at his sister's house, where he kept his clothes. When he arrived, defendant stamped his feet, as though his shoes were wet. Although testimony by the sister was sketchy and conflicting, the jury could reasonably have believed that defendant immediately shut the lights off. While there, he picked up pants, shirt and a pair of shoes, then left after about ten minutes. Two days later, he returned and vacuumed the floor of the house.

After leaving his sister's house with his change of clothing on the night of the crime, defendant next appeared at his girlfriend's apartment, noticeably favoring his shoulder. Asked by the occupants how he had gotten blood on the cuffs of his pants, defendant replied that he had been in a fight and broken the other person's nose. Defendant later said he'd had a fight with a black man at the Mill Restaurant. At another time he said he had fought two black men there. The Mill Restaurant was closed that night.

After changing his clothes, defendant gave the clothes he had been wearing to his girlfriend and asked her to wash them thoroughly. He then returned with Sorrell to Le Club, where the manager thanked them for helping "take care of the problem" of O'Neal. When the manager asked what had happened to O'Neal, defendant replied, "We lost him" and then volunteered: "He's pretty much of a ding-a-ling—he was always threatening to commit suicide."

Defendant and Sorrell began purchasing mixed drinks with large bills, buying drinks for others and leaving large tips. Earlier in the evening, they had purchased beers with exact change, leaving no tips. On the following day, defendant's brother noticed that, although defendant had been broke the day before, he now had money.

The next morning, Timothy O'Neal was discovered dead in the Winooski River. A trail of smeared blood, drag- and scuff-marks, scrapes and bruises, a lost sneaker and tears in O'Neal's trousers established that he had been pulled through the hole in the abutment and dragged, head first, face down, for a distance of about 55 feet, then placed in the river. His body snagged on a rock in the rapids above the falls, having been carried 75 yards downstream from the hole in the abutment. He had passed along the part of the river where the two men had been seen walking. There was no money in his wallet, and he wore no outer coat.

The cause of O'Neal's death was "asphyxia due to drowning" sometime between midnight and 3:00 a.m. Forensic examination determined that, before O'Neal was placed in the water, someone's arm had

> been wrapped around his neck in a choke hold, and that he had suffered three or four blows on the head with a large rock. The rock was found nearby, with several of O'Neal's hairs on it. O'Neal's hands had sustained injuries, apparently while fending off the blows.
>
> Police investigators questioned defendant. Describing his own activities on the night in question, defendant identified several bars that he had visited but did not mention the Mill Restaurant. Nor did he mention visits either to his sister's or girlfriend's homes. He told the police that after a black man, standing with two other black men and a white woman in front of Le Club, warned him to leave O'Neal alone, he never saw O'Neal again.
>
> After defendant's sister, girlfriend and other relatives were summoned to testify at an inquest, and after defendant learned of the inquest, he and Sorrell announced a trip to Canada and disappeared. Two months later, more than seven weeks after arrest warrants had issued, they surrendered in Florida, telling Florida police that they had been involved in a fight at Le Club.

*Miller*, 146 Vt. at 167–69, 502 A.2d at 834–35.

As the Vermont Supreme Court recognized, the State's case was built largely upon circumstantial evidence. *Id.* at 169, 502 A.2d at 835. Miller asserts that the State's case was "nothing but conjecture." (Doc. 6 at 2.) Miller's own version of the events is discussed below.

**Procedural History**

As noted above, the Vermont Supreme Court affirmed Miller's conviction in July 1985 on direct appeal. *Miller*, 146 Vt. at 164, 502 A.2d at 834. Miller subsequently moved for a new trial on grounds of newly discovered evidence, and in April 1989, the Vermont Supreme Court affirmed the denial of that motion. *Miller*, 151 Vt. at 337, 560

A.2d at 376.[1] Jeffrey Amestoy—who was Vermont's Attorney General at the time—represented the State on appeal from the denial of the motion for a new trial.

On July 12, 1989, Miller filed a petition for PCR in the Chittenden Superior Court. (Doc. 5-3 at 1.) The Superior Court denied the petition on June 10, 1991. (*Id.* at 4; *see also* Doc. 11-2.) Miller did not immediately pursue an appeal from that order, but on October 29, 1996 he obtained a stipulation in a second PCR case that allowed him to pursue an appeal from the June 10, 1991 order. (Doc. 5-7 at 4.) On November 27, 1996, Miller filed his notice of appeal from the June 10, 1991 order with the Vermont Supreme Court. (Doc. 5-10 at 1.)

In 1997, Jeffrey Amestoy was appointed Chief Justice of the Vermont Supreme Court. In 1998, the Amestoy Court issued two Entry Orders related to Miller's PCR petition. In an Entry Order dated March 5, 1998, the Supreme Court affirmed a Superior Court order finding insufficient evidence to grant his petition for PCR. *In re Miller*, 168 Vt. at 583, 718 A.2d at 420. In an Entry Order dated June 11, 1998, the Supreme Court denied as untimely Miller's March 19, 1998 motion to disqualify the five Justices who participated in the PCR appeal. *In re Miller*, 168 Vt. at 585, 718 A.2d at 422, *mot. for recons. denied* June 26, 1998. Justices Johnson and Skoglund, who participated in the PCR appeal along with Chief Justice Amestoy and Justices Dooley and Morse, were Assistant Attorneys General during the time that Miller's case was prosecuted by that office. *Id.* at 586, 718 A.2d at 422.

---

[1] One of the items of allegedly newly discovered evidence was Sorrell's confession that he was the sole murderer. Additional background on that issue is included in the discussion below regarding Miller's actual-innocence claim.

## Analysis

### I. Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) established a one-year limitations period for individuals seeking relief under 28 U.S.C. § 2254. *See* 28 U.S.C. § 2244(d)(1). The AEDPA's limitations period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* "Direct review" under subsection (A) includes direct review by the United States Supreme Court via a writ of certiorari, so "the limitations period for state prisoners . . . begins to run only after the denial of certiorari or the expiration of time for seeking certiorari." *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).

Here, the Vermont Supreme Court affirmed Miller's conviction in *State v. Miller*, 146 Vt. 164, 502 A.2d 832 (1985), and denied reargument on September 13, 1985. Miller did not file a petition for a writ of certiorari, and—under the applicable United States Supreme Court Rules at the time—the time to do so expired not more than 90 days after the Vermont Supreme Court denied reargument. *See* U.S. Sup. Ct. R. 20 (eff. Aug.

1, 1984).[2] Miller's § 2254 Petition—filed August 5, 2013—would therefore be untimely under subsection (A).

Subsections (B) and (C) do not apply. As to subsection (D), Miller has the burden of proving that he could not, with due diligence, have discovered the evidence that he now seeks to present in support of his Petition. *Wambolt v. Hofman*, No. 2:08 CV 250, 2009 WL 982170, at *4 (D. Vt. Apr. 13, 2009). Here, Miller asserts that Attorney Rose never told him that Chief Justice Amestoy and Justices Johnson and Skoglund had worked in the Attorney General's office, and he personally only became aware of that fact in June 2013. (*See* Doc. 4 at 5–6.) That allegation is insufficient to make June 2013 the date on which the limitations period begins to run under subsection (D). Miller could have discovered the three Justices' prior involvement with the Attorney General's Office through his participation in the PCR appeal (where that issue was the subject of his own March 19, 1998 motion to disqualify) and by reviewing the Supreme Court's June 11, 1998 Entry Order in *In re Miller*. A diligent litigant would have done both.

Miller's conviction became final before the enactment of the AEDPA on April 24, 1996. He is therefore "entitled to a one-year 'grace period,' meaning that [his] petition[] would not be barred if filed on or before April 24, 1997." *Rivas v. Fischer*, 687 F.3d 514, 534 (2d Cir. 2012) (quoting *Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998)). The grace period does not assist him, however, because he filed his Petition on August 5, 2013. In addition to the grace period, the limitations period is tolled during the time that

---

[2] The current rule is similar. *See* U.S. Sup. Ct. R. 13 (eff. July 1, 2013), *available at* http://www.supremecourt.gov/ctrules/2013RulesoftheCourt.pdf.

a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). That tolling provision also does not aid Miller. His (renewed) PCR petition in Superior Court was pending at the time AEDPA was enacted, and was not finally resolved until the Vermont Supreme Court denied his motion for reconsideration on June 26, 1998. Even giving Miller credit for the grace period and tolling under § 2244(d)(2), his filing on August 5, 2013 is still many years too late.

Miller does not argue for equitable tolling, and there is no suggestion that this case involves any "extraordinary circumstances" under which that doctrine might apply. *Rivas*, 687 F.3d at 538. I therefore conclude that Miller's Petition is untimely and that he does not qualify for equitable tolling. Consequently, I turn to Miller's contention that he is actually innocent.

## II. Actual-Innocence Exception

The United States Supreme Court has held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* [*v. Delo*, 513 U.S. 298 (1995)] and *House* [*v. Bell*, 547 U.S. 518 (2006)], or, as in this case, expiration of a statute of limitations." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013); *see also Rivas*, 687 F.3d at 518 ("[A] credible and compelling showing of actual innocence under the standard described by the Supreme Court in *Schlup* and *House* warrants an equitable exception to AEDPA's limitation period."). "To satisfy the *Schlup* standard, a claim of actual innocence must be both 'credible' and 'compelling.'" *Rivas*, 687 F.3d at 541 (citing *House*, 547 U.S. at 521).

"For the claim to be 'credible,' it must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* (quoting *Schlup*, 513 U.S. at 324).

> For the claim to be "compelling," the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."

*Id.* (quoting *House*, 547 U.S. at 538). The standard requires the Court "to consider all the evidence, old and new, incriminating and exculpatory, and, viewing the record as a whole, to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 542 (internal quotation marks omitted). This standard is demanding, and tenable actual-innocence claims are rare. *McQuiggin*, 133 S. Ct. at 1928.

Here, Miller says that he disagrees with the facts summarized by the *Miller* Court in its 1985 opinion. (Doc. 6 at 1.) For instance, Miller's defense at trial was that he and Sorrell were at a bar (not Le Club) and at his sister's and girlfriend's houses during the time of the murder. (*See* Doc. 6 at 7; Doc. 11-2 at 2.) In his Opposition—consistent with that defense—Miller maintains that he was at the other end of town at the time of the murder. (Doc. 6 at 1.) He says that the sneaker prints at the scene did not match the shoes he was wearing on the night of the murder. (*Id.* at 2.) He seems to deny that he changed his clothes that night. (*See id.*) He also asserts that Tobler's testimony was not credible. (*See id.* at 2, 6.)

Miller also offers explanations for some of the incriminating circumstantial evidence: he says that his shoes were wet because of spring runoff; that he shut the lights

off so as not to bother his sister; and that he returned to vacuum the house because he had agreed to help with chores. (*Id.* at 1.) He says he was favoring his shoulder at his girlfriend's house because of a prior injury. (*Id.*) He maintains that, after he returned to the bar, he only bought one mixed drink for an acquaintance from school, and that he left a three-dollar tip because it was "last call" and he did not want to wait for change. (*Id.*)

Miller's version of the events on the night of the murder is understandably different than the description given by the Vermont Supreme Court in its 1985 opinion. Consistent with the applicable standard on direct appeal, the Supreme Court summarized the evidence in the light most favorable to the State. For present purposes, this Court must examine whether Miller has supported his actual-innocence claim with new reliable evidence and must evaluate the impact of that evidence.

The only evidence that Miller has supplied in support of his actual-innocence claim consists of two affidavits: Michael Germaine's August 17, 2013 affidavit (Doc. 6-1), and Todd Gorton's October 1, 2013 affidavit (Doc. 8-1). In his affidavit, Michael Germaine states as follows, referring to Miller by his nickname "Pucky":

> [O]n the night that Tim O'[Neal] died Pucky Miller and Ricky Sorrell showed up at my house. We all went on my porch to smoke. When Pucky went inside Ricky gave me a lighter and told me it belonged to Tim O'[Neal] who he killed. I asked him if Pucky had anything to do with it and he said no. He said he got all wet because the body got stuck on something.
>
> I ran into Pucky here at Newport and asked him if he remembered this and he said no until I reminded him. Then he started saying that's right.

(Doc. 6-1.) Todd Gorton states as follows in his affidavit:

> I Todd Gorton ran into Pucky Miller here at NSCF [and] I asked him what he was doing. He said his parole officer violated him for admitting to drinking a beer.
>
> He further told me he was trying to get his case overturned. I said that I could not believe they convicted him in the first place. Ricky Sorrell had told me that Pucky had done nothing. He Sorrell killed that guy. I [know] this to be true. [I've] [known] Ricky Sorrell since the 80s in and out of jail. While in St. Albans together he Sorrell told me that they separated him and Pucky because Pucky was mad at him for refusing to answer questions at Pucky's trial. He said he told the investigators but it was [too] late and that was why Pucky was at the other end of the jail. I believe he also said something like Pucky had put him in jail. I forgot why.

(Doc. 8-1.) In short, Miller offers the affidavits to show that Sorrell was the sole murderer and that Miller was not involved.

Sorrell himself was charged with O'Neal's murder, but was acquitted after a jury trial that took place prior to Miller's trial. *Miller*, 146 Vt. at 169, 176. Sorrell's successful defense at his trial "was based, in part, upon the theory that the [S]tate's evidence demonstrated [Miller's] guilt, but not that of Sorrell." (Doc. 11-5 at 14, ¶ 21.)[3] Sorrell did not testify at Miller's 1983 trial, but on December 31, 1985, Sorrell told an investigator that he (Sorrell) had killed O'Neal and that Miller had not done so. (*Id.* at 18–19.) On May 16, 1986, Miller filed a motion for a new trial in his case on the grounds that, among other things, Richard Sorrell had confessed. (*Id.* at 22.) On October 31, 1986, at a hearing on Miller's motion for a new trial, Sorrell "denied under oath that he had killed Timothy O'Neal." (*Id.* at 30.)

[3] Document 11-5 is Respondent's Exhibit O, and is the Printed Case filed with the Vermont Supreme Court in the appeal from the Superior Court's denial of Miller's motion for a new trial. The portion of the Printed Case cited here is the Superior Court's "Findings of Fact, Conclusions of Law and Order." As noted above, the Supreme Court affirmed the Superior Court's decision denying Miller's motion for a new trial. *Miller*, 151 Vt. at 337.

With respect to Sorrell's December 31, 1985 confession, the trial court reasoned that the statement was hearsay and concluded that it should be excluded. (*Id.* at 30.)[4] The court went on to state:

> [U]nder Rule 804(b)(3) the Sorrell statement claiming his liability and exculpation of Miller cannot be admitted because no credible "corroborating circumstances [are shown that] clearly indicate the trustworthiness of the [Sorrell] statement." In fact, Sorrell's self-inculpatory statement is contradicted not only by Tobler's testimony, but also by Miller's statements. These statements include admissions such as "we lost him", and "he's pretty much of a ding-a-ling—he was always threatening to commit suicide" and "we'll take care of [O'Neal] for you". The circumstantial evidence of Timothy O'Neal's death is also entirely inconsistent with the acts of one person and, in fact, two people were seen walking by the Winooski River just after O'Neal died and they were looking into the water. See 146 Vt. at pp. 167–169. The Sorrell "confession" is patently untrustworthy.
>
> Even if this court were to treat the Sorrell "confession" as substantive evidence its weight and credibility would be nil. Sorrell's account is against established facts concerning the death instrument (a rock), and the manner and cause of death as presented through the Deputy State Pathologist. The account is also contradicted by Sorrell's actions with those of the defendant and O'Neal in Le Club, outside of that establishment and immediately thereafter. Sorrell had nothing to lose by his "confession" and it is, thus, unworthy of belief.

(*Id.* at 31–32.) The trial court denied Miller's motion for a new trial. On appeal from that denial, Miller did not discuss the Sorrell confession in his appellate brief (Doc. 11-8) or his reply brief (Doc. 11-10), and the Vermont Supreme Court did not even mention Sorrell in its April 7, 1989 opinion affirming the Superior Court's ruling. Sorrell died in March 1996. (*See* Doc. 11-17 at 2, ¶ 14.)

[4] Apparently the only evidence of Sorrell's confession was the investigator's affidavit recounting what Sorrell had said. (*See id.*) The trial court also concluded that Sorrell's confession "was not made admissible by the exception in Rule 804(b)(3) VRE because as to the homicide, Sorrell was not subject to reprosecution thereby not tending to subject him to criminal prosecution." (*Id.*)

The two 2013 affidavits that Miller has offered are not "reliable" for the purposes of the credibility prong of the *Schlup* analysis. The affidavits report statements that Sorrell allegedly made to the affiants in the 1980s. The timing of the "new evidence" therefore undermines its reliability. Moreover, neither affidavit would be admissible to prove that Sorrell was O'Neal's sole murderer; the affiants' statements that Sorrell confessed to them are hearsay for which there is no exception to permit their admission into evidence. *See* Fed. R. Evid. 804(b); V.R.E. 804(b). Also, the alleged confessions directly contradict Sorrell's sworn testimony on October 31, 1986 that he did *not* kill O'Neal. Finally, this is not the first time that Miller has sought to prove that Sorrell confessed to being the sole murderer. Miller's May 16, 1986 motion for a new trial advanced a similar alleged confession, which the Superior Court found to be inadmissible, untrustworthy, and not credible.

The 2013 affidavits also are not "compelling" evidence of innocence. Even if the affidavits were admissible to show that Sorrell was O'Neal's sole killer, it is not at all likely that a reasonable juror would have reasonable doubt about Miller's guilt. For the same reasons that the Superior Court articulated, the weight and credibility of Sorrell's alleged confessions is negligible.

For the above reasons, I conclude that Miller has not made a credible or compelling claim of actual innocence. Therefore no basis exists for granting an exception to AEDPA's one-year limitations period. Miller's due-process and ineffective-assistance claims (both stemming from Chief Justice Amestoy and his colleagues'

participation in Miller's PCR appeal) are therefore time-barred. Respondent's Motion to Dismiss (Doc. 5) on that basis should be granted.

**CONCLUSION**

For the reasons set forth above, I recommend that the Court GRANT Respondent's Motion to Dismiss (Doc. 5) and DISMISS Miller's Petition (Doc. 4).

Dated at Burlington, in the District of Vermont, this 21st day of January, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).